Pamela GARRETT, et al., Plaintiffs,

v.

**UNIFIED GOVERNMENT OF ATHENS–CLARKE COUNTY, et al., Defendants.**

No. 3:99–CV–104(DF).

United States District Court, M.D. Georgia, Athens Division.

Feb. 28, 2003.

Eric Keith Krasle, James S. Grimes, Athens, GA, for plaintiffs.

Andrew Hulsey Marshall, Michael C. Pruett, Brian Sheen Carney, Athens, GA, Jack Gibson Slover, Jr., Phillip E. Friduss, Jonathan Marigliano, Terry E. Williams, Lawrenceville, GA, Theodore Freeman, Matthew Peter Stone, Atlanta, GA, for defendants.

FITZPATRICK, District Judge.

This case involves civil rights claims for damages brought under 42 U.S.C.A. § 1983 (West 1994 & West Supp.2002) by Pamela Garrett[1] against the Unified Government of Athens–Clarke County, Georgia, Jack Lumpkin, Raymond Von Anderson, Donald Eckert, Ryan McGee, and Lloyd Nash.[2] Plaintiff also asserts var-

1. Ms. Garrett is named as Plaintiff in three capacities: (1) individually, (2) as next friend and administratrix of the estate of Eric William Irby, and (3) as next friend and legal guardian of Valerie Nicole Irby. Although this means that there are technically three Plaintiffs, the Court will refer to Ms. Garrett as "Plaintiff" for the sake of simplicity.

2. This order deals with the motion for summary judgment filed by the Unified Government of Athens–Clarke County, Georgia, Jack Lumpkin, Raymond Von Anderson, Donald Eckert, Ryan McGee, and Lloyd Nash. References in this order to "Defendants" are intended to include these Defendants only and not any of the original Defendants that have been dismissed. Furthermore, references in this order to "Defendants" are not intended to refer to any John Doe Defendants or Franklin County Sheriff's Department.

In her complaint, Plaintiff asserts claims against various John Doe Defendants. Because the John Doe Defendants have not been identified, they have not yet had the opportunity to file an answer or raise the affirmative defense of qualified immunity. Additionally, discovery has been completed, and even in the face of a motion for summary judgment, Plaintiff has not sought to amend her complaint to identify any of the John Doe Defendants. Accordingly, Plaintiff's claims against the John Doe Defendants are hereby dismissed.

ious state-law claims against Defendants. Before the Court is Defendants' Motion for Summary Judgment (tab # 130).

## I. STANDARD OF REVIEW

Summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party; however, the Court may not make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Maynard v. Williams,* 72 F.3d 848, 851 (11th Cir.1996).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (internal

quotation marks omitted). If the moving party discharges this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the nonmoving party is not entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324–26, 106 S.Ct. 2548. This evidence must consist of more than mere conclusory allegations or legal conclusions. *See Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir.1991). Under this scheme, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

## II. FACTS

Viewing the facts in the light most favorable to the Plaintiff, the pertinent facts are as follows. On July 19,1997, at approximately 4:11 a.m., Officer Cleveland of the Franklin Springs Police Department initiated a traffic stop of a pick-up truck driven by Eric William Irby. Officer Cleveland attempted to stop the vehicle because he observed a tail light violation and suspected that the driver was under the influence. However, Irby failed to stop his vehicle and instead led Officer Cleveland on chase through several counties at speeds ranging from sixty-five to eighty-five miles per hour. Officer Buffington of

---

It is unclear whether the parties still consider Franklin County Sheriff's Department to be a defendant in the instant case. The Court notes that Franklin County and Hugh Roach, the Sheriff of Franklin County, were dismissed from the case on January 16, 2001, as part of a stipulated dismissal. The stipulated dismissal, however, did not name Franklin County Sheriff's Department as a party being

dismissed. Because a sheriff's department is not a legal entity subject to suit under § 1983, *see Dean v. Barber,* 951 F.2d 1210, 1214 (11th Cir.1992), and because the parties agreed to the dismissal of Franklin County and the Sheriff of Franklin County, the Court hereby orders that Franklin County Sheriff's Department be dismissed from the case.

the Royston Police Department, Officer Phillips of the Franklin County Sheriff's Department, and Officer Carr of the Madison County Sheriff's Department joined Officer Cleveland in the pursuit of Irby. The chase ended in Athens–Clarke County after approximately forty-five minutes to one hour, when one of the pursuing officers forced Irby's vehicle off of the road and into a ditch.

After Irby's vehicle came to rest in the ditch, Officer Cleveland stopped his police cruiser directly in front of Irby's vehicle in order to prevent him from moving the vehicle. Officer Cleveland then went to the passenger side of the vehicle where he took the passenger into custody. As Irby began to get out of the truck, Officer Carr approached the driver's side of the vehicle, whereupon the two men began to struggle. Officer Carr struck Irby over the head with his gun. Irby then began running across an open field, which was adjacent to the road, with Officers Carr, Buffington, and Phillips in pursuit. At some point during these events, Officer Carr's gun was fired, either when he struck Irby over the head with his gun or while Irby was running away, however, the bullet did not hit anyone.

The three officers eventually caught up with Irby and an extended struggle ensued. While the exact sequence of events is unclear, it is undisputed that during this time: (1) the officers attempted to gain control over Irby by repeatedly striking him with a baton or flashlight, (2) the officers were able to handcuff Irby with his wrists in front of his body, (3) Irby was forced to the ground, and (4) the officers pinned Irby to the ground by applying force to his back with their body weight.

During the struggle, officers from the Athens–Clarke County Police Department began to arrive at the scene. Sergeant Nash was the first Athens–Clarke County officer to arrive and he remained at the shoulder of the road in order to direct traffic. Prior to the arrival of the other Athens–Clarke County officers, a call went out over the police radio for leg restraints. When Officer Eckert and Officer Von Anderson arrived a short time later, Sergeant Nash directed them to take leg restraints into the field and assist the other officers in subduing Irby. Officer Eckert took his RIPP Hobble Cord, which is an adjustable nylon strap or rope, approximately four feet in length with clips at each end, into the field. A few minutes later Officer McGee arrived at the scene and joined the other officers in the field.

Once the Athens–Clarke County officers reached the ongoing struggle, Officer Eckert used a pair of handcuffs to join Irby's ankles. While Irby continued to resist, Officer Eckert attempted to attach the hobble cord to the ankle cuffs in order to place Irby in what is commonly referred to as a "hog-tie" or "hobbled" position. The parties have agreed that for the purposes of this case the term "hobbling" means the binding of a subject's ankles and wrists, and then the connection of the ankles to the wrists behind the subject's back by means of a rope, chain, or strap, in such a way that the bound person's legs cannot be fully extended. The Court will use the term "hog-tie" to mean that the distance between the subject's wrists and ankles was less than twelve inches, causing the body to be put in a bow position.

Irby continued to struggle, making it difficult for Officer Eckert to place him in a hobbled or hog-tie position. In order to assist Officer Eckert, one of the officers from another jurisdiction sprayed Irby's face with O.C. spray, which is commonly known as pepper spray and used by police to subdue suspects or prisoners. The officers agree that within a few seconds of applying the O.C. spray, Irby became com-

pliant. After Irby became compliant, the officers re-cuffed Irby's hands so that they were positioned behind his back and finished restraining Irby using the hobble or hog-tie method. The parties dispute how much space separated Irby's wrists and ankles, however, the Court finds that Plaintiff has presented sufficient evidence at the summary judgment stage so that a reasonable jury could infer that Irby was hog-tied.

Officers Eckert, Von Anderson, and McGee carried Irby back to the roadside in the hobble or hog-tie position so that his chest and face were hanging down. The officers placed Irby on his stomach off to the side and behind a running police cruiser. The distance between Irby and the cruiser is disputed, with estimates ranging from five to twenty feet. Officer Von Anderson checked to make sure that Irby had a pulse and felt that he had one. At some point after the officers brought Irby back to the roadside, one of the officers called for an ambulance. The officers did not check on Irby again until the ambulance arrived.

Upon arrival, the paramedics found Irby in distress and still bound. The paramedics directed the officers to remove Irby's restraints and transported him to the Athens Regional Medical Center where he was pronounced dead. An autopsy was performed on Irby's body and Dr. Kopnen, Deputy Chief Medical Examiner of Georgia, listed the cause of death as "Positional Asphyxiation ('Hog Tie Restraint')." Furthermore, in the opinion portion of the autopsy report Dr. Kopnen stated that "[t]his death occurred in police custody and was the direct result of being restrained in a 'hog-tied' fashion." The autopsy also found methamphetamine in Irby's system and listed methamphetamine as a significant contributing factor in Irby's death. Dr. Kopnen's report was

reviewed and approved by Dr. Sperry, the Chief Medical Examiner of Georgia. The coroner of Athens–Clarke County, Randall Garrett, recorded the cause of death as homicide by positional asphyxiation. Defendants' expert, Dr. Karch, believes that Irby died as a result of a condition called "excited delirium" with other contributing factors.

Athens–Clarke County police officers are trained pursuant to a written policy that instructs officers to provide first aid to a person exposed to O.C. spray as soon as possible. This policy also requires officers to carry a neutralizing solution with them in their patrol cars. After Irby was placed at the roadside, one of the officers from another jurisdiction asked Officer Eckert for water or neutralizing solution in order to remove O.C. spray that had gotten onto his lip during the struggle with Irby. Officer Eckert provided the requesting officer with a spray bottle of water that he carried in his cruiser to remove O.C. spray. However, the officers did not use neutralizing solution or water to decontaminate the O.C. spray from Irby's face.

The Unified Government did not have a written policy concerning the use of the hobble or hog-tie restraint technique. Furthermore, Officer Eckert admits that he received no training in the hobble restraint method from the police department and that he had purchased the hobble cord on his own. In fact, the only familiarity Officer Eckert had with the hobble method came from the instructions that came with the hobble cord, by practicing the method on his father, and by watching other officers employ the technique. The police officers involved in this incident stated that they had often seen other officers hobble or hog-tie suspects. Both Officers Eckert and McGee had hobble cords in their possession on the night of the incident with

Irby. The Athens–Clarke County officers were not disciplined for their actions in this incident. Chief Lumpkin stated that he learned that some Athens–Clarke County police officers were using the hobble or hog-tie restraint to subdue suspects a few days before Irby's death, and that he verbally instructed certain supervisors to put a stop to the practice immediately.

Plaintiff argues that there was considerable information available to the law enforcement community prior to the incident with Irby that warned officers of the severe dangers posed by the hobble or hog-tie restraint method. In support of this contention, Plaintiff offers the following evidence: (1) numerous cases that had arisen nationwide prior to Irby's death, (2) numerous bulletins from various police departments and law enforcement agencies that had arisen nationwide in the years prior to the current incident, (3) evidence that other police departments had abandoned or explicitly prohibited the hog-tie restraint, and (4) the deposition of Thomas Barker, Ph.D., a potential expert witness, who testified that information about the dangers of positional asphyxiation and the hobble restraint technique was well know in the law enforcement community. Plaintiff also offered a 1992 report warning of the dangers of positional asphyxiation, which was furnished to Plaintiff by Defendants during discovery. Although the Unified Government denies that it had possession of this report prior to Irby's death, the Court finds that Plaintiff has created an issue of fact as to when the Unified Government received the report.

## III. DISCUSSION

### A. Section 1983 Claims

Plaintiff asserts various claims against Defendants under § 1983 for violations of the Fourth and Fourteenth Amendment to the Constitution of the United States. For purposes of convenience, the Court will first evaluate Plaintiff's claims against Officers Von Anderson, Eckert, McGee, and Nash. The Court will then turn to Plaintiff's claims against Lumpkin, Chief of the Athens–Clarke County Police Department, and the Unified Government.

### 1. Von Anderson, Eckert, McGee, and Nash

#### a. *Official Capacity Claims*

 Plaintiff has asserted claims against Von Anderson, Eckert, McGee, and Nash in their official capacity as Athens–Clarke County police officers. An action for damages under § 1983 against a local government employee in his official capacity is tantamount to an action for damages against the local government entity that the employee represents. *See Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Thus, it is no longer necessary for plaintiffs "to bring official-capacity actions against local government officials, for ... local government units can be sued directly for damages and injunctive and declaratory relief." *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Because Plaintiff has directly sued the Unified Government, her official capacity claims against Von Anderson, Eckert, McGee, and Nash are redundant and unnecessary to adjudicate. *See Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1184 n. 16 (11th Cir.1994); *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991) (per curiam).

#### b. *Individual Capacity Claims*

Pursuant to § 1983, Plaintiff has sued Officers Von Anderson, Eckert, McGee, and Nash in their individual capacities for violations of Irby's constitutional rights under the Fourth and Fourteenth Amend-

ments. Additionally, Plaintiff has brought a claim against the individual officers for violating her rights and the rights of Irby's minor child under the Fourteenth Amendment. In return, the officers argue that they are entitled to qualified immunity.

### i. Qualified Immunity Principles

■■■ Qualified immunity offers complete protection for governmental officials sued in their individual capacities if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted).

■■■ To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* Here, it is clear that the officers were acting within the course and scope of their discretionary authority in apprehending and securing a suspect. Furthermore, Plaintiff has not disputed that Defendants were acting within the scope of their discretionary authority when the alleged violations occurred, and the Court has no reason to believe otherwise. *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998).

■■■ "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the Plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. The

Supreme Court has set forth a two-part test for use in determining whether qualified immunity exists. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, ——, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). If a constitutional right would have been violated under the plaintiff's version of the facts, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *see also Lee*, 284 F.3d at 1194. Thus, the Court will now apply this two-part test to Plaintiff's various claims under § 1983 in order to determine whether Von Anderson, Eckert, McGee, and Nash are entitled to qualified immunity.

### ii. Unreasonable Seizure and Arrest Without Probable Cause Under the Fourth Amendment

■■■ Plaintiff's complaint alleges that Von Anderson, Eckert, McGee, and Nash unreasonably seized Irby and arrested him without probable cause in violation of his Fourth Amendment rights. Even under Plaintiff's version of the facts, it is clear that no constitutional violation occurred. First, Officer Cleveland observed that Irby's vehicle had a tail light violation and suspected that Irby was driving under the influence. Second, when the officer attempted to stop the vehicle, Irby initiated a car chase. And finally, when the car chase ended, Irby continued to evade officers by getting out of the vehicle and running across an adjacent field. These facts would provide any reasonable officer with sufficient justification for seizing and arresting Irby. Accordingly, Defendants are entitled to qualified immunity with respect to Plaintiff's § 1983 claims for unrea-

sonable seizure and arrest without probable cause under the Fourth Amendment.

### iii. Excessive Force Under the Fourth Amendment

#### a. Constitutional Violation

 Plaintiff contends that Defendants used excessive force in arresting Irby, thereby violating his Fourth Amendment rights.[3] "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197 (citing *Graham*, 490 U.S. at 394–95, 109 S.Ct. 1865). However, "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Id.* (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

 In order to determine whether police officers violated the Fourth Amendment, the Court must decide whether the officers' conduct was objectively reasonable in light of the facts confronting the officer. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865; *see also Lee*, 284 F.3d at 1197 (stating that "to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force

is necessary in the situation at hand") (internal quotation marks omitted). The officer's use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Facts and circumstances that a court should consider in determining whether an officer's actions were objectively reasonable include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Lee*, 284 F.3d at 1197–98.

Considering the factors laid out in *Graham*, the Court finds that the officers were objectively reasonable in their use of force up to and including the application of O.C. spray. First, although the officers were attempting to stop Irby for a taillight violation and suspected driving under the influence—misdemeanor crimes—Irby was combative, thereby posing an immediate threat to the safety of the officers. Furthermore, before the use of O.C. spray, Irby was actively resisting and attempting to evade arrest by flight. Therefore, the Court finds that the officers were reasonable in their use of force up to and including the use of O.C. spray. *See Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) (noting that "[c]ourts have consistently concluded that using pepper spray is reasonable ... where the plaintiff was

---

**3.** Plaintiff also argues that Defendants used excessive force in violation of Irby's Fourteenth Amendment rights. However, the Supreme Court has held that *"all* claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard, rather than under a substantive due process approach." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted). Here, it

is undisputed that Defendant law enforcement officers used physical force to subdue and restrain Irby, therefore, the Court finds that Irby was seized. *See Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (finding that a seizure occurs when officers "by means of physical force or show of authority, ... in some way restrained the liberty of a citizen"). Thus, the Court will analyze Plaintiff's excessive force claim solely under the Fourth Amendment and dismiss her excessive force claim to the extent that it is based on the Fourteenth Amendment.

either resisting arrest or refusing police requests").

However, the Court finds that Plaintiff's allegations about the officers' use of force after the application of O.C. spray, if true, establish a Fourth Amendment violation. After the application of O.C. spray, all of the officers agree that Irby became compliant. In fact, Officer McGee indicated in his deposition that Irby was no longer making any movement. Looking at the *Graham* factors in light of Irby's compliance, the Court finds that a reasonable jury could conclude that the officers' use of force was unconstitutionally excessive. First, Irby's crimes, a tail light violation and suspected driving under the influence, were misdemeanors. Second, Irby's compliance greatly reduced the threat to the officers' safety. In addition, the officers' use of the term "compliant" to describe Irby's behavior necessarily indicates that Irby was no longer actively resisting arrest or attempting to evade arrest by flight. Although the officers may have had some concern that Irby would begin to struggle anew, a jury could still find that the further use of force was unnecessary and excessive, especially because Irby's hands and ankles were cuffed and he was surrounded by at least six officers. Therefore, the *Graham* factors lead the Court to conclude that the officers' use of the hog-tie restraint, after Irby had been sprayed with O.C., was not objectively reasonable.

Leaving aside that fact that Irby was compliant when the officers hog-tied him, the Court finds that a reasonable law enforcement officer should have been aware that the practice of hog-tying suspects was a dangerous technique that required officers to use extreme caution. A review of the known dangers of the hog-tie restraint supports this position. Initially, case law from other circuits informs of tragic examples of positional asphyxiation stemming from the hog-tie restraint, especially in instances involving individuals of diminished capacity. *See Cruz v. City of Laramie,* 239 F.3d 1183, 1186 (10th Cir.2001) (involving a suspect who died suddenly after being hog-tied by the police in June of 1996); *Gutierrez v. City of San Antonio,* 139 F.3d 441, 442–43 (5th Cir.1998) (involving a suspect who died after being hog-tied by police in November of 1994); *Johnson v. City of Cincinnati,* 39 F.Supp.2d 1013, 1014 (S.D.Ohio 1999) (involving a suspect who died in July of 1995 after police placed him in a prone position with his hands and feet cuffed behind his back).

In addition to case law, Plaintiff provided the Court with literature, which was available in the law enforcement community prior to the incident with Irby, discussing the relationship between improper restraints and positional asphyxia. These materials include reports, studies, police bulletins, and various periodical and newspaper articles. For example, a June 1995 bulletin from the United States Department of Justice warns officers to avoid hog-tying where possible and lists guidelines for instances when hog-tying is necessary. These guidelines instruct officers to get the suspect off his stomach as soon as possible, ask the suspect if he is under the influence of drugs or alcohol, and carefully monitor the suspect for any potential breathing difficulties. A February 1995 bulletin from the Chicago Police Department also warns that "because of positional asphyxia, hog-tying must always be avoided." The bulletin goes on to warn that if hog-tying is used, officers should monitor the suspect closely making sure to "be aware of any obvious physical disabilities, mental state, or the possibility the subject is under the influence of alcohol or narcotics."

However, even if an officer had never read this literature or was unfamiliar with the hog-tie incidents that occurred in other circuits, the Court finds that an objectively reasonable officer would not have hog-tied Irby in the circumstances faced by the officers in this case. For instance, the officers in this case knew: (1) that Irby had been involved in an extended struggle that would cause a normal person to breathe hard, (2) that Irby had a visible head wound, (3) that Irby had been sprayed with O.C., a substance commonly know to cause the exposed person to have difficulty breathing. Any reasonable officer, even one who has never been instructed on the proper way to hog-tie, would recognize that hog-tying a suspect in the presence of these factors would constitute the use of excessive force. The fact that the officers did nothing to alleviate Irby's condition (e.g. decontaminate the O.C. spray from his face, roll him onto his side, or even monitor him closely) also points toward a finding that the officers used excessive force. Additionally, at the time the officers hog-tied Irby, he was compliant and surrounded by at least six officers with both his hands and ankles in cuffs. In sum, because Irby was compliant after the application of O.C. spray and because of the obvious dangers of putting someone in Irby's condition in the hog-tie position, the Court concludes that the officers violated Irby's Fourth Amendment right to be free from excessive force.

Contrary to Defendants' argument, the Eleventh Circuit's opinion in *Cottrell v. Caldwell*, 85 F.3d 1480 (11th Cir.1996), does not preclude the Court from denying qualified immunity. The plaintiff in *Cottrell* was involved in a twenty-minute struggle with police officers. *See id.* at 1488. After the officers gained control over the plaintiff, they cuffed his wrist and ankles, placed him face down in the back of their police cruiser, and transported him to the police station. *See id.* During transport, the plaintiff died of positional asphyxia. *See id.* The Eleventh Circuit reversed the district court's denial of qualified immunity. *See id.* at 1492.

First, it is important to point out that the use of excessive force in *Cottrell* occurred after arrest to a pre-trial detainee who was being transported in the back of a police cruiser, not in the course of apprehending a suspect as in the instant case. Therefore, the Eleventh Circuit analyzed the plaintiff's excessive force claim under the Fourteenth Amendment, which provides a more onerous standard for plaintiffs to meet because it requires deliberate indifference on the part of the officers. *See id.* at 1490. However, the Supreme Court has held that "*all* claims that law enforcement officers have used excessive force … in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard, rather than under a substantive due process approach." *Graham*, 490 U.S. at 395, 109 S.Ct. 1865. As a consequence of the Supreme Court's holding in *Graham*, this Court is bound to apply the standards laid out for Fourth Amendment excessive force claims.

Moreover, in *Cottrell*, the officers did not use O.C. spray, the plaintiff did not have a visible head wound, and the plaintiff's wrists and ankles were not connected in a hog-tied manner. In addition, the incident in *Cottrell* occurred seven years before the incident with Irby, at a time when the literature about the dangers of restraints and positional asphyxia was not as well known to the law enforcement community. These facts distinguish *Cottrell* from the case at bar.

▇▇▇▇▇ Finally, the Court notes that, contrary to Defendants' assertion, the fact

that Officer Nash was directing traffic at the roadside when Irby was initially put in the hog-tie restraint, does not mean that he cannot be found liable for violating Irby's constitutional rights. An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance. *See Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1560 (11th Cir. 1993), *as amended,* 14 F.3d 583 (11th Cir. 1994) ("A police officer has a duty to intervene when another officer uses excessive force"). Officer Nash was aware that Irby had been in an extended struggle with the officers in the field. Additionally, once Irby was placed at the roadside, Officer Nash could see that his fellow officers had put him in the hog-tie position and that he was no longer struggling. Finally, because the other officers were decontaminating themselves of the O.C. spray, Officer Nash was almost certainly aware that O.C. spray had been used on Irby during the struggle. Despite this knowledge, Officer Nash did not intervene to alleviate the risks posed by the hog-tie restraint. Accordingly, Officer Nash can be held liable for violating Irby's Fourth Amendment rights.

### b. Clearly Established Law

Because the facts, taken in the light most favorable to Plaintiff, show that the conduct of Von Anderson, Eckert, McGee, and Nash violated a constitutional right, the next question is whether that constitutional right was "clearly established" at the time of the violation. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. In *Hope,* the Supreme Court made clear that when determining whether a constitutional right is clearly established, "the salient question ... is whether the state of the law ... gave [the officers] *fair warning* that their alleged treatment of [the

plaintiff] was unconstitutional." *Hope,* 122 S.Ct. at 2516 (emphasis added). A plaintiff is not required to show that the very act in question was previously held unlawful, only that the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The Court finds that the officers did have fair and clear warning that their treatment of Irby, specifically the use of the hog-tie restraint on a suspect that was of obvious diminished capacity and compliant at the time of restraint, was unconstitutional. The Court begins by noting that in 1997 there was no Eleventh Circuit or Supreme Court case law that specifically held it unconstitutional to hog-tie a suspect after he was compliant and where there were obvious factors that could contribute to a suspect's distress. However, such a fact-specific precedent is not always needed to overcome qualified immunity. We must also inquire as to whether Von Anderson, Eckert, McGee, and Nash's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [them], notwithstanding the lack of fact-specific case law." *Lee,* 284 F.3d at 1196 (internal quotation marks omitted). As the Eleventh Circuit has noted, "preexisting case law, tied to the precise facts, is not in every case essential." *Marsh v. Butler County,* 268 F.3d 1014, 1031 n. 9 (11th Cir.2001).

The Court finds that in the instant case, even without preexisting case law, the obvious dangers inherent in hog-tying a suspect in these circumstances gave the officers notice of the unconstitutional character of their alleged actions. As discussed earlier, the officers in this instant case knew: (1) that Irby had been in-

volved in an extended struggle that would cause a normal person to breathe hard, (2) that Irby had a visible head wound, (3) that Irby had been sprayed with O.C., a substance commonly know to cause the exposed person to have difficulty breathing. The Court finds that just as the obvious cruelty inherent in the actions of the prison officers in *Hope* should have given them some notice of the unconstitutional nature of their actions, the obvious danger of hog-tying someone in Irby's condition should have provided these officers with some notice that their actions were unconstitutional. *See Hope*, 122 S.Ct. at 2518 (finding that the "obvious cruelty" of the hitching post provided the prison officials with some notice that their conduct violated the plaintiff's constitutional rights).

The Court's conclusion is further strengthened because the Eleventh Circuit has often found the use of force after a suspect is compliant to be obviously and clearly unconstitutional despite a lack of fact-specific case law. *See Lee*, 284 F.3d at 1200 (applying "the *clear and obvious* principle that once an arrest has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ ... severe and unnecessary force") (emphasis added); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir.2000) (concluding that it was clearly established that once an initially disorderly suspect had been fully secured, further use of force was unconstitutional); *Priester v. City of Riviera Beach*, 208 F.3d 919, 926–27 (11th Cir. 2000) (denying qualified immunity in light of clearly excessive force by officer who allowed a police dog to attack a suspect who was already subdued and lying on the ground); *Smith v. Mattox*, 127 F.3d 1416, 1419–20 (11th Cir.1997) (per curiam) (denying qualified immunity to officer in an excessive force case where officer broke suspect's arm after suspect submitted to

the officers' request); *see also McQurter v. City of Atlanta*, 572 F.Supp. 1401, 1414 (N.D.Ga.1983) (denying qualified immunity to officers, despite the fact that plaintiff provoked a struggle, because "[o]nce [the plaintiff's] hands and feet were manacled ... he was effectively restrained, and continued use of the choke hold was excessive").

Because the unconstitutional nature of hog-tying a suspect under the circumstances facing the officers in the instant case would have been obvious to a reasonable officer, the Court finds that the officers had fair warning that their conduct was unconstitutional. *See Gutierrez*, 139 F.3d at 445–46 (denying qualified immunity to officers who hog-tied a suspect, despite a lack of prior precedent, because a reasonable officer would have known that his actions constituted the unconstitutional use of deadly force). Accordingly, Officers Von Anderson, Eckert, McGee, and Nash are not entitled to qualified immunity with respect to Plaintiff's claim for excessive force under the Fourth Amendment.

### iv. Denial of Familial Association Under the Fourteenth Amendment

Plaintiff's complaint alleges that Von Anderson, Eckert, McGee, and Nash violated her rights and the rights of Irby's minor child to familial association under the substantive due process component of the Fourteenth Amendment. The doctrine of substantive due process is designed to "protect[ ] those rights that are fundamental—rights that are implicit in the concept of ordered liberty." *Skinner v. City of Miami, Fla.*, 62 F.3d 344, 347 (11th Cir.1995) (internal quotation marks omitted). "Fundamental rights, implicit in the concept of ordered liberty, include ... assorted freedoms against state intrusion into family life and intimate personal deci-

sions." *Sotto v. Wainwright*, 601 F.2d 184, 191 (5th Cir.1979) (internal quotation marks omitted).[4] Specifically, the Supreme Court has recognized the concept of familial rights in contexts where the government engages in conduct directly aimed at affecting the familial relationship. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (right of extended family to share household); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (woman's right to decide whether to have an abortion); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (right to marry a person of another race).

In the context of excessive force claims, such as the one at issue, courts have held that a law enforcement officer's use of excessive force is not directed at altering the familial relationship, but rather, has an incidental affect on the familial relationship. *See Rucker v. Harford County*, 946 F.2d 278, 282 (4th Cir.1991) (finding that police conduct in apprehending a suspect was not directed at and did not directly impinge upon the family relationship, and therefore, did not violate his father's liberty interest in intimate association with the family), *cert. denied*, 502 U.S. 1097, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992); *see also Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir.1993) ("Not every statement or act that *results* in an interference with the rights of intimate association is actionable. Rather, to rise to the level of a constitutional claim, the defendant must *direct* his or her statements or conduct at the intimate relationship with the knowledge that the statements or conduct will adversely affect that relationship"); *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir.1991) ("State action that affects the parental relationship

only incidentally ... even though the deprivation may be permanent, as in the case of unlawful killing by the police, is not sufficient to establish a violation of an identified liberty interest."), *cert. denied*, 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991).

Here, Defendants' use of excessive force cannot be fairly characterized as being aimed at disrupting Plaintiff's familial association with Irby. Plaintiff has presented no evidence that Defendants used excessive force with the intention of interfering with Plaintiff's right to associate with Irby; instead, the deprivation of association was an incidental affect of Defendants' use of excessive force. Moreover, it is clear that the Supreme Court is reluctant to expand the concept of substantive due process and has cautioned against the open-ended judicial expansion of unenumerated rights. *See County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ("guideposts for responsible decision making in this [substantive due process area] are scarce and open-ended. The doctrine of judicial restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field."). In light of the general reluctance to expand fundamental rights under substantive due process and the case law from other circuits, the Court declines to hold that the officers' use of excessive force violated the constitutional rights of Plaintiff and Irby's minor child under the Fourteenth Amendment. *See Pittsley*, 927 F.2d at 8 ("only the person toward whom the state action was directed, and not those incidentally affected, may maintain a § 1983 claim"). Ac-

---

**4.** The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981. *See*

*Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

cordingly, Defendants are entitled to qualified immunity with regard to Plaintiff's familial association claim.

### 2. Police Chief Lumpkin and the Unified Government

#### a. *Official Capacity Claims Against Lumpkin*

As explained with regard to Plaintiff's official capacity claims against Von Anderson, Eckert, McGee, and Nash, an action for damages under § 1983 against a local government employee in his official capacity is tantamount to an action for damages against the local government entity that the employee represents. *See Brandon,* 469 U.S. at 471–72, 105 S.Ct. 873. Thus, it is no longer necessary for plaintiffs "to bring official-capacity actions against local government officials, for ... local government units can be sued directly for damages and injunctive and declaratory relief." *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. 3099. Because Plaintiff has directly sued the Unified Government, her official capacity claims against Lumpkin are redundant and unnecessary to adjudicate. *See Hill,* 40 F.3d at 1184 n. 16; *Busby,* 931 F.2d at 776.

#### b. *Claims Against the Unified Government*

▇▇▇▇▇ A municipality cannot be held liable under § 1983 on the basis of respondeat superior. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, a municipality can only be held liable under § 1983 where a plaintiff can demonstrate that he suffered a violation of his constitutionally protected rights pursuant to a custom or policy of the municipality. *See id.* at 690–91, 98 S.Ct. 2018; *see also Busby,* 931 F.2d at 776; *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1479–80 (11th Cir.1991). Plaintiff advances several theories on

which to base municipal liability in the instant case. First, Plaintiff contends that Irby suffered a violation of his constitutional rights pursuant to a custom or policy of the Unified Government allowing police officers to unconstitutionally hog-tie suspects. Second, Plaintiff asserts that the Unified Government is liable for violating Irby's rights because it had a policy or custom of failing to discipline officers who used excessive force. Finally, Plaintiff argues that the Unified Government is liable on a failure to train theory.

Taking each of Plaintiff's theories in turn, the Court first notes that in the instant case, the Unified Government had no formal, written policy instructing officers to hog-tie suspects in a manner that would violate their constitutional rights. Therefore, the Court must now determine whether the Unified Government had informally adopted a custom of unconstitutionally hog-tying suspects. *See Fundiller v. City of Cooper City,* 777 F.2d 1436, 1442 (11th Cir.1985) ("Although not necessarily adopted by a person or body with rulemaking authority, customs can become so settled and permanent as to have the force of law."). The Court finds that Plaintiff has presented sufficient evidence to show that the Unified Government had a widespread custom of using the hog-tie restraint on suspects. For instance, the officers in this case testified in their depositions that they had regularly observed officers employ the hog-tie or hobble restraint in the field. Moreover, on the night of the incident with Irby, Sergeant Nash sent a call out over the police radio for restraints, and both Officers McGee and Eckert responded by bringing hobble or hog-tie cords to the scene, further indicating that the hog-tie restraint was frequently used by officers.

However, a finding that there was widespread use of the hog-tie restraint does not automatically equate to a finding that

there was widespread *unconstitutional* use of the hog-tie restraint so as to impose municipal liability. The Court does not believe that hog-tying is in all cases unconstitutional, only that hog-tying a suspect in the circumstances faced by the officers in the instant case was unconstitutionally excessive. The unconstitutionality of the officers' conduct in the case at bar stems from the use of the hog-tie restraint after an extended struggle, in combination with obvious injuries and O.C. spray, and without proper precautions, such as placing Irby on his side or closely monitoring his breathing. Although Plaintiff has presented evidence that Athens–Clarke County officers regularly used the hog-tie restraint, she has not presented any evidence from which a reasonable jury could infer that the hog-tie restraint was persistently employed in an unconstitutional manner so as to constitute a custom of the Unified Government.

■ Next, Plaintiff argues that the Unified Government had a custom or policy of failing to discipline officers who used excessive force. The Eleventh Circuit has noted that "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of *Monell.*" *Fundiller,* 777 F.2d at 1443. Plaintiff points out that the officers in this case were not reprimanded for their treatment of Irby. However, "[w]ithout evidence that these practices were widespread, or that the municipality persistently failed to discipline officers for such known unconstitutional conduct, such a policy cannot be inferred from the municipality's isolated decision not to discipline the officers involved in this incident." *McQurter v. City of Atlanta,* 572 F.Supp. 1401, 1420 (N.D.Ga.1983) (internal citations omitted).

In an effort to demonstrate a persistent failure to take disciplinary action, Plaintiff has presented evidence that excessive force complaints had previously been lodged against Officers Eckert and Von Anderson, but Plaintiff does not indicate whether the complaints had any merit nor does she specify what disciplinary action was or was not actually taken. In any event, the evidence put forth by Plaintiff is insufficient to indicate that other instances of excessive force persistently went unpunished by the Unified Government so as to support a finding of municipal liability.

■ The Court does find, however, that Plaintiff has presented sufficient evidence that the Unified Government's training program on restraint techniques, as instituted by Lumpkin, whom Defendants admit is the final policy maker with regard to police practices, was so inadequate as to serve as the basis for municipal liability. To establish a claim under § 1983 for failure to adequately train, Plaintiff has the burden of proving three elements: (1) the municipality's training program is inadequate to the tasks that the officers must perform, (2) the inadequacy is the result of the municipality's "deliberate indifference," and (3) the inadequacy is "closely related to" or "actually caused" the injury. *See City of Canton v. Harris,* 489 U.S. 378, 389–90, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To defeat the Unified Government's Motion for Summary Judgment, Plaintiff must point to specific facts which would show there is a genuine issue for trial on each of these three elements. The ultimate burden on Plaintiff is high; "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Supreme Court's] prior cases—can a [municipality] be liable for such a failure under § 1983." *Id.* at 389, 109 S.Ct. 1197.

With regard to the first element, the Court finds that genuine issues of material fact remain. The Unified Government admits that they did not provide their officers with training in the hog-tie restraint technique or on the dangers of positional asphyxiation. Plaintiff has presented evidence that studies and bulletins on the dangers of positional asphyxiation and the hog-tie restraint method were so widespread in the law enforcement community as to give the Unified Government notice of the dangers of hog-tying. Furthermore, it is reasonable to believe that police officers are frequently confronted with situations where they must restrain combative suspects. Therefore, Plaintiff has presented sufficient evidence to infer that the lack of training program on hog-tie restraints and positional asphyxiation constituted an inadequate training program.

 Plaintiff must next show that the Unified Government's failure to have an adequate training program rose to the level of deliberate indifference. *See Canton*, 489 U.S. at 388, 109 S.Ct. 1197; *see also Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir.1998). "A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). An inadequate training program can constitute deliberate indifference if the lack of a training program leads to constitutional violations sufficient to put a county on notice of a problem. *See id.* As the Court discussed earlier, Plaintiff has presented insufficient evidence to show that Athens–Clarke County officers were regularly hog-tying suspects in an unconstitutional manner. However, a pattern of constitutional violations is not always necessary to impose municipal liability. When a violation of federal rights is a "plainly obvious consequence" of the municipal action, there

may be deliberate indifference on the part of the municipality, and also sufficient proof to "support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Brown*, 520 U.S. at 409–10, 117 S.Ct. 1382; *Canton*, 489 U.S. at 390, 109 S.Ct. 1197 (noting that there may be instances where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"); *Riley v. Newton*, 94 F.3d 632, 638 (11th Cir.1996) (recognizing that a municipality could be deliberately indifferent where "the need for more and different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights"); *see also Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir.1993) (per curiam) (noting that "a single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force behind the violation was a municipality policy or custom'") (quoting *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 n. 10 (11th Cir.1985)).

Here, as previously noted, it is reasonable to believe that police officers will frequently be involved in situations where they are required restrain combative suspects. Plaintiff presented sufficient evidence that the Unified Government was on notice that officers were hog-tying suspects. For example, on the night of the incident with Irby, a call for hobble cords went out over the police radio. This call illustrates that the hobble or hog-tie restraint technique was occurring frequently enough that officers knew that the restraint devices needed to hog-tie someone were available in many of the officers' police cruisers. In addition, the officers involved in this case testified that they had

often witnessed other officers hobble or hog-tie suspects, and at least two of the Athens–Clarke County officers involved in this incident brought hobble or hog-tie restraints to the scene. In light of these facts, it is highly likely that the Unified Government was aware that its officers were using the hog-tie method on a widespread basis.

Moreover, Plaintiff has presented evidence that studies and bulletins on the dangers of positional asphyxiation and the hog-tie restraint method were so widespread in the law enforcement community as to give the Unified Government notice that improper use of hobble or hog-tie restraints was dangerous. Thus, it was highly predictable that an officer lacking specific training in proper restraint techniques would violate citizen's rights. *See Brown*, 520 U.S. at 409, 117 S.Ct. 1382. Therefore, the Court finds that the need for more training on proper restraint techniques, including the hog-tie method, was so obvious, and the lack of such training so likely to result in the violation of constitutional rights, that the Unified Government can reasonably be said to have been deliberately indifferent.

Lastly, Plaintiff must show that the inadequacy in training was "closely related to" or "actually caused" Irby's injury. *See Canton*, 489 U.S. at 389–90, 109 S.Ct. 1197. As stated earlier, when a violation of federal rights is a "plainly obvious consequence," as in the instant case, it also "support[s] an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Brown*, 520 U.S. at 410, 117 S.Ct. 1382. If the officers in the instant case had been trained under a program that explained the proper use of the hog-tie restraint or how to decrease the possibility of positional asphyxia, they would have been more likely to refrain from hog-

tying Irby under the circumstances. Specifically, if the officers had been trained to understand that placing Irby on his stomach or using the hog-tie method in combination with O.C. spray increased the risk of injury, they would have been more likely to put Irby on his side or wipe away the O.C. spray, in turn decreasing the force placed on Irby's breathing. Thus, the Court concludes that the lack of an adequate training program was closely related to Irby's death.

■ The Court rejects Defendants' argument that Lumpkin's verbal order to a supervisor to discontinue the hog-tie restraint cuts off liability to the Unified Government. The Court finds that Plaintiff has called into doubt whether Lumpkin had indeed banned hog-tying. Evidence showing that a week or more after Lumpkin had directed a supervisor to immediately put a stop to the practice of hog-tying, officers still had hobble or hog-tie cords, were still requesting such equipment over the police radio, and were actually continuing to use the hog-tie method, supports the inference that Lumpkin either did not give the order or did not give it in a manner that was likely to have any real effect on his officers' conduct. Furthermore, Plaintiff's potential expert witness on police practices, Thomas Barker, Ph.D., testified in his deposition that a verbal order would be an unreasonable and impractical way to implement a ban on hog-tying.

In sum, Plaintiff has met her burden on all three elements. Therefore, the Court finds that material issues of fact preclude summary judgment with regard Plaintiff's claim for failure to train against the Unified Government. *See McQurter*, 572 F.Supp. at 1421 (finding that a municipality's failure to train officers in the proper use of choke holds could be the basis for a successful failure to train claim under

§ 1983); *Johnson*, 39 F.Supp.2d at 1020 (denying the city's motion for summary judgment in a case involving the hog-tie restraint because the city had notice of the hazards associated with the restraint and was deliberately indifferent in failing to train officers on how to deal with the risks).

### c. *Individual Capacity Claims Against Lumpkin*

 Plaintiff argues that Lumpkin is liable in his individual capacity, under the theory of supervisory liability. Lumpkin, as Chief of the Athens–Clarke County Police Department, was the supervisor in charge of Officers Von Anderson, Eckert, McGee, and Nash. Like municipalities, supervisory officials may not be held liable under § 1983 on the basis of respondeat superior; rather, they may only be held liable under § 1983 for their own wrongful conduct. *See, e.g., H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir.1986) (citing *Monell*, 436 U.S. at 691, 98 S.Ct. 2018); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990). However, the standard for imposing supervisory liability differs slightly from the standard for municipal liability. Specifically, an individual can be held liable on the basis of supervisory liability either "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Brown*, 906 F.2d at 671. Here, there are no allegations that Lumpkin personally participated in Irby's arrest. Thus, the Court turns to the question of whether there was a causal connection between Lumpkin's actions and the deprivation of Irby's constitutional rights.

 A causal connection is "established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Id.; see also Fundiller*, 777 F.2d at 1443 (noting that a "causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need for improved training or supervision, and the official fails to take corrective action"). Furthermore, "[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration." *Id.* Therefore, in the case at bar, a causal connection can only be established if the unconstitutional use of the hog-tie restraint was sufficiently widespread so as to put Lumpkin on notice of the need to act and he failed to do so.

The Court finds that Plaintiff has failed to present evidence of a history of unconstitutional, widespread abuse of the hog-tie restraint sufficient to put Lumpkin on notice. As the Court noted earlier, a finding that there was widespread use of the hog-tie restraint does not automatically equate with a finding of widespread abuse. Plaintiff has not presented any evidence of previous complaints or injuries resulting from suspects being hog-tied by Athens–Clarke County police officers. Simply put, Plaintiff has failed to present sufficient evidence of flagrant, rampant, and continued abuse of the hog-tie restraint so as to impose supervisory liability.

### B. *State Law Claims*

Plaintiff asserts various state law claims against Defendants. Specifically, Plaintiff claims that Officers Von Anderson, Eckert, McGee, and Nash are liable for state constitutional violations, assault and battery, false arrest, false imprisonment, intentional infliction of emotional distress, outrageous conduct, conspiracy to commit obstruction of justice, obstruction of justice, and negligence. In addition, Plaintiff has

brought a negligence claim against Lumpkin, as well as the Unified Government. In return, the individual defendants, Von Anderson, Eckert, McGee, Nash, and Lumpkin, contend that they are entitled to official immunity, while the Unified Government contends that it is entitled to sovereign immunity.

Any state law claims Plaintiff may be attempting to bring against Von Anderson, Eckert, McGee, Nash, and Lumpkin in their official capacities are in actuality claims against the Unified Government and will be treated as such. *See Donaldson v. Dep't. of Transp.*, 262 Ga. 49, 56, 414 S.E.2d 638 (1992) ("While suits against public employees in their personal capacities involve official immunity, suits against public employees in their official capacities are in reality suits against the state and, therefore, involve sovereign immunity."). For purposes of convenience, the Court will first determine whether the Unified Government is entitled to sovereign immunity. The Court will then analyze whether official immunity bars any remaining state law claims against Von Anderson, Eckert, McGee, Nash, and Lumpkin in their personal capacities.

### 1. Claims Against the Unified Government

Sovereign immunity, unless specifically waived by statute, protects the State and all of its departments and agencies from suit. Ga. Const., art. I, § 2(e). This constitutional reservation of sovereign immunity to the State has been extended to the counties. *See Gilbert v. Richardson*, 264 Ga. 744, 747, 452 S.E.2d 476 (1994); *see also Swan v. Johnson*, 219 Ga.App. 450, 452, 465 S.E.2d 684 (1995) (holding that a unified government of a county was entitled to sovereign immunity because a unified government follows the law and rules of tort liability applicable to

counties). Therefore, because the Plaintiff has not pointed the Court to, and the Court has not found, a statute that waives sovereign immunity in the circumstances presented by the instant case, the Court finds that the Unified Government is entitled to sovereign immunity.

### 2. Claims Against Von Anderson, Eckert, McGee, Nash, and Lumpkin in their Personal Capacities

The doctrine of official immunity offers limited protection from suit to government officers and employees sued in their personal capacities. *See Gilbert*, 264 Ga. at 750, 452 S.E.2d 476. Municipal officers "are subject to suit only when they negligently perform or fail to perform their 'ministerial functions' or when they act with actual malice or intent to cause injury in the performance of their 'official functions.'" *Gilbert*, 264 Ga. at 753, 452 S.E.2d 476 (citing Ga. Const., art. I, § 2, ¶ 9(d)). The Supreme Court of Georgia has interpreted the term "official functions" to mean "any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts." *Id.* Therefore, municipal officers are not entitled to official immunity if they perform their ministerial functions in a negligent manner or with actual malice or intent to injure. *See id.* However, with regard to the performance of discretionary functions, municipal officers only lose their official immunity when they act with actual malice or intent to injure, and retain their official immunity when they merely act in a negligent manner. *See id.* Thus, to determine whether Defendants are entitled to official immunity, the Court must first determine whether they were performing ministerial or discretionary acts. Georgia courts have explained the distinction between ministerial and discretionary acts as follows:

[a] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining facts, reaching conclusions, and acting on them in a way not specifically directed.

*Carter v. Glenn,* 249 Ga.App. 414, 416, 548 S.E.2d 110 (2001).

■ Von Anderson, Eckert, McGee, and Nash's conduct, arresting and subduing a fleeing suspect, clearly constitutes a discretionary act. The officers in the instant case were required to exercise their personal judgment as to the amount of force to use on Irby. Therefore, in this case, unless Plaintiff can show that the officers acted with actual malice or the intent to injure Irby, the officers are immune from liability. In the context of official immunity, " 'actual malice' requires a deliberate intention to do wrong." *Merrow v. Hawkins,* 266 Ga. 390, 391, 467 S.E.2d 336 (1996). The Court has not found, and Plaintiff has not pointed to, any evidence that would indicate that the officers used excessive force with actual malice or actual intent to inflict injury. In fact, Plaintiff's fifty-one page response to Defendants' Motion for Summary Judgment included only one paragraph discussing her state law claims, and it contained only three sentences and no citations to authority or the record. Plaintiff has simply not put forth sufficient evidence from which a reasonable jury could infer that the officers had the deliberate intention to do wrong. Accordingly, Von Anderson, Eckert, McGee, and Nash are entitled to official immunity with regard to Plaintiff's state law claims.

Similarly, with regard to Lumpkin, "[t]he operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function." *Carter,* 249 Ga.App. at 416, 548 S.E.2d 110 (holding that a police chief was entitled to official immunity for claims brought against him in his personal capacity). Again, the Court has not found, and Plaintiff has not directed the Court to, any evidence that would indicate that Lumpkin trained and supervised his officers with actual malice. Therefore, Lumpkin is also entitled to official immunity with regard to Plaintiff's state law claims.

## IV. CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** part, and **DENIED** in part. Specifically, the Court finds as follows:

1. Defendants' Motion for Summary Judgement is **GRANTED** with respect to Plaintiff's § 1983 official capacity claims against Von Anderson, Eckert, McGee, and Nash.

2. Defendants' Motion for Summary Judgement is **GRANTED** with respect to Plaintiff's § 1983 individual capacity claims against Von Anderson, Eckert, McGee, and Nash for unreasonable seizure and arrest without probable cause under the Fourth Amendment.

3. Defendants' Motion for Summary Judgement is **DENIED** with respect to Plaintiff's § 1983 individual capacity claims against Von Anderson, Eckert, McGee, and Nash for excessive force under the Fourth Amendment.

4. Defendants' Motion for Summary Judgement is **GRANTED** with respect to Plaintiff's § 1983 individual capacity claims against Von

Anderson, Eckert, McGee, and Nash for excessive force under the Fourteenth Amendment.

5. Defendants' Motion for Summary Judgement is **GRANTED** with respect to Plaintiff's § 1983 individual capacity claims against Von Anderson, Eckert, McGee, and Nash for denial of familial association under the Fourteenth Amendment.

6. Defendants' Motion for Summary Judgement is **GRANTED** with respect to Plaintiff's § 1983 official capacity claims against Lumpkin.

7. Defendants' Motion for Summary Judgement is **GRANTED** with respect to Plaintiff's § 1983 claims against the Unified Government for instituting a policy or custom of unconstitutionally hog-tying suspects and for failure to discipline its officers.

8. Defendants' Motion for Summary Judgement is **DENIED** with respect to Plaintiff's § 1983 claim against the Unified Government for failure to adequately train its officers.

9. Defendants' Motion for Summary Judgement is **GRANTED** with respect to Plaintiff's § 1983 individual capacity claims against Lumpkin.

10. Defendants' Motion for Summary Judgement is **GRANTED** with respect to all of Plaintiff's state law claims.

In addition, the Court finds that:

1. Plaintiff's claims against the John Doe Defendants are hereby **DISMISSED.**

2. Plaintiff's claims against Franklin County Sheriff's Department are hereby **DISMISSED.**