Pliakos v. Manchester, NH, et al.    CV-01-461-M    07/15/03
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Faye Pliakos, Administrator
of the Estate of Konstantinos Pliakos,
      Plaintiff

      v.                                Civil No. 01-461-M
                                        Opinion No. 2003 DNH 118
City of Manchester, New Hampshire
Police Chief Mark Driscoll,
Sergeant Lloyd Doughty,
Officers Maureen Tessier,
William Jones, Marc Lachance, and
David Laferriere,
      Defendants


**O R D E R**


     On October 13, 1999, Konstantinos Pliakos died while in the

custody of Manchester police officers.  Faye Pliakos, the

administrator of his estate, brings this action against the City

of Manchester, its chief of police (in his official capacity),

and several members of its police force, seeking compensatory,

enhanced compensatory, and punitive damages.  In short, plaintiff

says the individual defendants violated Mr. Pliakos's state and

federal rights when, after engaging in a violent struggle with

Pliakos incident to taking him into custody, they handcuffed him

and left him on his stomach for approximately five minutes.  At some point during that period, Pliakos asphyxiated.

Plaintiff's fourteen count complaint sets forth two federal claims pursuant to 42 U.S.C. § 1983: one against the individual police officers for having used excessive force to restrain Pliakos, in violation of his federally protected civil rights (count one); and one against the City and its police chief (in his official capacity) for failing to properly hire and train the City's police officers (count three).[1]  Defendants assert that the undisputed material facts establish that they are entitled to judgment as a matter of law.  Accordingly, they move for summary judgment.  Plaintiff objects.

## Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable

---

[1]     By order dated May 7, 2002, the court granted defendants' motion to dismiss count two of plaintiff's complaint - a claim against the individual police officers for having engaged in a conspiracy to violate Pliakos's federally protected rights.

inferences in that party's favor." <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." <u>International Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citations omitted). As the Court of Appeals for the First Circuit has observed, "the evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial. Conclusory allegations, improbable inferences, and unsupported

3

speculation will not suffice." <u>Cadle Co. v. Hayes</u>, 116 F.3d 957, 960 (1st Cir. 1997) (citations and internal quotation marks omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with <u>evidence</u> that conflicts with that proffered by the moving party. <u>See generally</u> Fed. R. Civ. P. 56(e). Consequently, while a reviewing court must take into account all properly documented facts, it may ignore bald assertions, unsupported conclusions, and mere speculation, <u>see</u> <u>Serapion v. Martinez</u>, 119 F.3d 982, 987 (1st Cir. 1997), as well as those allegations "which have since been conclusively contradicted by [the non-moving party's] concessions or otherwise," <u>Chongris v. Board of Appeals</u>, 811 F.2d 36, 37 (1st Cir. 1987).[2]

---

[2]    Here, for example, plaintiff concedes that, notwithstanding the allegations in her complaint to the contrary, Pliakos was <u>not</u> "hog-tied" at any time during the morning in question. <u>See</u> Plaintiff's memorandum at 10, n.*.

**Background**

Based upon the deposition testimony of the individual defendants and the State Police report of investigation into the circumstances surrounding Mr. Pliakos's death, the parties agree on the material facts that led up to Pliakos's arrest. They also agree that the officers used reasonable force in subduing Pliakos and taking him into custody. They disagree, however, as to whether the responding officers' conduct was "objectively reasonable" once Pliakos was handcuffed and in the officers' custody.

I.   Events Leading to Pliakos's Arrest.

At approximately 3:19 a.m. on October 13, 1999, the Manchester Police Department received a 911 emergency call from a person who reported that a large, naked man was shouting incoherently and running into traffic on Interstate Highway 293. Approximately five minutes later, Officers Tessier and Jones were instructed to respond. According to Manchester police dispatch records, at 3:32:28 a.m., Tessier informed her dispatcher that she had arrived at the scene. See Exhibit 8 to defendants'

5

memorandum, N.H. State Police Time Analysis of Manchester Police Department Radio Dispatch Tape.

As Tessier approached Pliakos, who weighed approximately 300 pounds and was not wearing any clothing, she saw that he was lying underneath the center guardrail which divides the northbound and southbound lanes of Interstate 293. She illuminated him with her flashlight and asked if he was alright. Pliakos got to his feet and suddenly attacked her, biting her head and gouging her eyes with his fingers. Before additional officers arrived at the scene, Tessier managed to free herself from Pliakos, only to be attacked by him at least two more times. Tessier recovered from the attacks and, by using a remote door release, she was eventually able to release a police dog from her cruiser, which attempted to subdue Pliakos. Nevertheless, Pliakos managed to kick and beat the dog away. Pliakos then turned his attention back to Tessier and grabbed her. She managed to shove him away and he fell to the ground.

At that point, Officer Jones arrived at the scene. Meanwhile, Pliakos was able to get back to his feet and again

advanced toward Tessier.  She directed the dog to subdue Pliakos again, and the dog managed to bite Pliakos on the thigh.  Again, however, Pliakos was able to knock the dog away.  Tessier repeatedly commanded Pliakos to stop, but he advanced toward her and grabbed her.  According to Tessier, she feared that her service weapon was in jeopardy, so she struck Pliakos on the shoulder with her flashlight, causing him to disengage.  As Jones approached the scene, Pliakos dashed toward Tessier's cruiser (which she had left running, with the lights on).  Pliakos climbed in and got behind the wheel.  Tessier jumped into the vehicle and positioned herself between Pliakos and the steering wheel, in an effort to prevent him from operating the vehicle and driving off.  Tessier and Pliakos struggled, while Jones attempted to pull Pliakos from the vehicle - efforts that were hampered by virtue of the fact that Pliakos was not wearing any clothes.  Tessier succeeded in keeping Pliakos's hands away from the gearshift and was finally able to remove the key from the ignition, as Jones sprayed Pliakos on the side of his face with a one or two-second burst of oleoresin capsicum aerosol (also known as OC spray or cap stun).  Pliakos did not respond and continued

7

to struggle, prompting Jones to spray him again, this time directly in the face.

Pliakos then became less combative and the officers struggled to pull him from the vehicle. Once they succeeded in doing so, they leaned Pliakos over a nearby highway guardrail (with his feet remaining on the ground). Although Jones was able to secure a handcuff to one of Pliakos's wrists, Pliakos renewed his struggle with the officers in an effort to free his arms. At about that time, Officer Lachance arrived at the scene and attempted to assist the other officers in restraining Pliakos. During the struggle, the officers pulled Pliakos off the guardrail and wrestled him to the ground on the side of the highway.

Once Pliakos was on the ground, lying on his stomach, the officers were able to secure the other handcuff to his free wrist. At 3:33:57 a.m. - one minute and 29 seconds after Tessier first arrived at the scene - Sergeant Doughty advised Manchester police dispatch that Pliakos was in custody. Up to that point, plaintiff concedes that the conduct of the responding police

8

officers was reasonable under the circumstances and the force used in an effort to subdue Pliakos was neither unreasonable nor excessive.

## II.  Pliakos's Subsequent Death.

Although both wrists were cuffed and he was lying on his stomach, Pliakos continued to struggle, trying to roll over onto his shoulder so he could stand up.  Officers Jones and Lachance responded by holding him down on the ground - one officer leaned against his mid-back with his knee, while the other applied pressure to Pliakos's shoulders.

The officers' accounts of the events that followed differ somewhat; in particular, each officer recalls the duration of Pliakos's continued resistance slightly differently.  Officer Lachance recalls that Pliakos "was struggling the whole time that [he] had contact with [Pliakos], sometimes more strenuously than others. . . . to the best of [Lachance's] recollection, [he and other officers] were struggling with him right up until the wagon arrived and [officers] said, 'Okay, get up.'"  Exhibit 6 to plaintiff's memorandum, deposition of Marc Lachance at 35.

9

Officer Tessier, who was no longer immediately beside Pliakos, recalls that she saw him struggling with the officers up until "maybe ten seconds or so" before he was told to get to his feet. Exhibit 4 to plaintiff's memorandum, deposition of Maureen Tessier at 44. Officer Jones recalls that about two minutes after Pliakos was wrestled to the ground and the other handcuff secured to his free wrist, he stopped resisting. Exhibit 5 to plaintiff's memorandum, deposition of William Jones at 32 (stating that approximately three minutes elapsed after Pliakos stopped struggling and he was told to get to his feet). See also Exhibit 8 to defendants' memorandum, N.H. State Police Time Analysis of Manchester Police Department Radio Dispatch Tape (noting that 4 minutes and 57 seconds elapsed between the time Sergeant Doughty reported that Pliakos was in custody and an ambulance was requested). Viewing the facts in the light most favorable to plaintiff, the court will assume that Officer Jones' recollection of the events in question is most accurate.

According to Jones, about two minutes after Pliakos stopped struggling and while he remained handcuffed and lying on his stomach, Jones heard Pliakos exhale. Jones deposition at 32.

10

Jones says he thought it was simply a result of Pliakos being tired, and interpreted it as evidence of his decision to finally stop struggling and submit to the arrest. Nevertheless, Jones and Lachance remained immediately beside Pliakos, poised to hold him down again if he resumed his efforts to get to his feet. Id. at 34 (stating that he recalled that Lachance kept his knee on or near Pliakos's shoulder and, as to his own conduct, saying, "It wasn't more of holding him, it was more or less just keeping [my] knee there [i.e., near Pliakos's back] so that if he did attempt to get back up again I could push him back down with the knee.").

Meanwhile, with Pliakos in custody, Tessier left the scene to secure both her canine partner and her cruiser, while Officers Leighton and Chandonnet examined and treated her injuries. At about the same time, the police "wagon" (which had been summoned earlier) arrived to transport Pliakos. According to Officer Jones, about one minute after he heard Pliakos exhale, Officer Laferriere came over and instructed Pliakos to get to his feet. Id. at 32. When Pliakos did not respond to Laferriere's command, Laferriere and Jones attempted to lift Pliakos to his feet and escort him to the police wagon. Pliakos remained unresponsive.

11

Accordingly, the officers rolled Pliakos onto his back and discovered that he was not breathing and that his lips were blue. They immediately began CPR, while an ambulance was summoned. According to Manchester police dispatch logs, the ambulance was summoned at 3:38:54 a.m., approximately six and one-half minutes after Tessier arrived at the scene and discovered Pliakos hiding under the guardrail. Plainly, then, the events in question (many of which were quite violent) occurred during a decidedly brief period of time.

Since Pliakos was "in custody" and restrained on his stomach for just under five minutes, see State Police Time Analysis at 3, and because Jones recalls that he was told to get to his feet approximately three minutes after he stopped struggling, see Jones deposition at 32, he stopped struggling about two minutes after he was taken to the ground and the second handcuff secured to his free wrist. So, viewing the record evidence in the light most favorable to plaintiff, the following time line can be constructed with regard to the nearly five minutes Pliakos was restrained on his stomach: (1) after Pliakos was wrestled to the ground and the second handcuff secured to his free wrist,

12

Sergeant Doughty notified Manchester dispatch that he was "in custody"; (2) Pliakos continued to struggle with the officers for about two minutes before he finally stopped resisting arrest; (3) about two minutes later, Jones heard him exhale; and (4) about one minute after that, Pliakos was told to get to his feet, at which time the officers discovered that he was not breathing, began CPR, and summoned an ambulance.

Manchester police officers continued their efforts to resuscitate Pliakos until the ambulance arrived and emergency medical technicians took over. Jones removed Pliakos's handcuffs and resuscitation efforts continued, as Pliakos was taken to the ambulance. Efforts to revive him at the scene were unsuccessful and he was pronounced dead at a local hospital later that morning.

III. The Autopsy.

That same day, the state medical examiner performed an autopsy on Mr. Pliakos. His report included the following conclusions:

> **Cause of death:** Asphyxia [due to] compression of chest, rear handcuffing and prone position after physical struggle with multiple blunt impacts [due to] acute cocaine intoxication with agitated delirium.
>
> **Contributory Cause of Death:** Bipolar affective disorder; obesity with cardiac hypertrophy [i.e., an enlarged heart].

Exhibit 1 to plaintiff's memorandum, Final Cause of Death Report at 1. In the summary portion of his report, the medical examiner gave the following opinion:

> It is my opinion that Konstantinos Pliakos, a 23 year old white male, died as a result of a complex interplay of several factors over a relatively short period of time (less that five minutes in total). . . . The factors include: 1) acute cocaine intoxication with agitated delirium, 2) asphyxia, 3) physical exertion with multiple impacts, 4) prone positioning during struggle and restraint, 5) transient compression of the chest from the back, 6) rear handcuffing, 7) obesity with cardiac hypertrophy, and 8) bipolar affective disorder.

Id. at 9.

IV.  The Manchester Police Training Video.

Prior to the events underlying this litigation, the Manchester Police Department produced a training video on the

14

subject of restraint asphyxia, a rare[3] phenomenon that can occur when several factors coalesce and make it difficult for a restrained individual to breath.  In that video, the training officer cautions that, "[p]ositional asphyxia basically is a death as a result of the body position, which interferes with one's ability to breath, and it occurs when a confrontational situation with law enforcement, or anyone for that matter, takes place."  Exhibit 8 to plaintiff's memorandum, Transcript of Video Presentation on the Subject of Positional Asphyxia, at 1.  Later in the presentation, the training officer says:

> The paper goes on to give us some guidelines for caring for subdued subjects.  The New York City Police Department also has some guidelines for caring [for] your subdued subject.  And what the paper, the Justice Institute, recommends and NYPD recommends is that as soon as the subject is handcuffed, it's imperative to get that person . . . off his stomach.  Either turn [the subject] on the side or place him in a seated position.  If a person continues to struggle, don't sit on his back.  They say you can hold his legs down, wrap his legs, wrap his legs with a strap, but please try not to sit on the person's back.  It also recommends that we do not tie the handcuffs [and] the leg ankle restraints to each other much in a hog-tie manner.

---

[3]     Plaintiff's complaint quotes the state medical examiner's report for the proposition that "the phenomenon of 'restraint asphyxia' is well described in the forensic medicine literature with nearly 120 case reported [in the past 15 years]." Complaint at para. 24.

> . . . If you observe the condition of decreased
> respirations or difficulty with respirations, get the
> subject immediate medical attention.

Id. at 3. That video tape was shown during at least some of the Manchester Police Department roll call meetings in the days immediately before Pliakos's death. Each of the officers involved in that incident, however, denies having seen the video until some time after the events of October 13, 1999.

**Discussion**

I. Claims Against the Individual Police Officers.

Plaintiff asserts that the defendant police officers' decision to leave Pliakos on his stomach, with his hands cuffed behind him, caused him to die of positional asphyxia. Some of the "risk factors" that can contribute to positional asphyxia that were present in this case include: (1) obesity; (2) cardiac hypertrophy; (3) drug intoxication; (4) participation in a violent struggle or other excited behavior (causing the heart to race and adrenaline levels to rise); (5) exposure to OC spray; and (6) use of rear handcuffing while the subject is in a prone position, on his or her stomach. See, e.g., Exhibit 8 to plaintiff's memorandum, Transcript of Video Presentation on the

16

Subject of Positional Asphyxia; Exhibit 9 to plaintiff's memorandum, affidavit of Michael Cosgrove at para. 9.

Plaintiff says that since the Manchester Police Department had in its possession a training video on positional asphyxia and presented that video at roll call to at least some of its officers in the days immediately preceding the incidents involved in this case, the individual defendants knew or should have known that Pliakos was at high risk for positional asphyxia. Accordingly, says plaintiff, the officers at the scene should not have left him restrained, lying on his stomach. Instead, they should have either: (1) rolled him onto his back or positioned him in a seated position; or (2) if they decided that, for legitimate security reasons, he needed to remain on his stomach (to minimize the risk that he again attempt to get to his feet and flee, possibly into oncoming traffic on the highway), more carefully monitored his breathing until the transport wagon arrived and Pliakos was removed from the ground.

While plaintiff does not challenge any of the officers' conduct leading up to Pliakos's arrest, she alleges that, by

17

leaving him on his stomach despite his risk of positional asphyxia, the officers used excessive force in effectuating his arrest and, in so doing, violated Pliakos's clearly established Fourth Amendment right to be free from unreasonable seizures. Consequently, what distinguishes this case from the typical one involving claims of excessive force is that plaintiff says the officers' inaction (i.e., failing to reorient Pliakos once he was secure and/or failing to more carefully monitor his breathing) constitutes excessive force:

> An objectively reasonable officer should have been aware of the grave danger presented by continuing to restrain Mr. Pliakos in the rear handcuffed, prone position. Despite the well-documented danger of restraint asphyxia, Mr. Pliakos was restrained in this position for approximately five minutes - long after he was subdued. During this time, the defendant police officers could have easily adjusted Pliakos' body position to eliminate the danger of restraint asphyxia - they failed to do so. Alternatively, they could have closely monitored his breathing - the undisputed material facts demonstrate that they did not. Instead, Mr. Pliakos slowly suffocated to death. Therefore, notwithstanding defendants' prior reasonable application of force, maintaining the restraint, while neglecting to monitor Mr. Pliakos' vital signs, was excessive and in violation of his fourth amendment rights.

> \* \* \*

> As stated above, the plaintiff [does] not allege that the defendant officers' efforts to subdue Pliakos

18

> constituted excessive force. However, continuing to
> restrain him, after he was handcuffed and subdued, in a
> position that posed an obvious and significant threat
> of restraint asphyxia, was excessive.

Plaintiff's memorandum at 9, 13 (emphasis in original).


The individual police officers, on the other hand, deny that their conduct was in any way violative of Pliakos's constitutional rights and say that all force used in effecting his arrest and maintaining custody was reasonable under the circumstances. Moreover, those officers claim that even if, with the benefit of hindsight, one might reasonably conclude that Pliakos's Fourth Amendment rights were violated, they are still entitled to qualified immunity, since a reasonable police officer presented with the same circumstances would not have realized that simply leaving Pliakos on his stomach for the brief period of time after he stopped struggling, and failing to notice that he had stopped breathing for approximately one minute, would amount to the use of excessive force.

A.    <u>Excessive Force</u>.

The United States Supreme Court has made clear that "all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis in original).  Plaintiff implicitly acknowledges this.  So, while her complaint alleges that defendants violated Pliakos's "rights secured by the fourth, eighth and fourteenth amendment to the United States Constitution," complaint at para. 1, in her memorandum in opposition to summary judgment, she correctly presses only her Fourth Amendment claim.

The Fourth Amendment to the Constitution guarantees the right of individuals to be free from "unreasonable searches and seizures."  Not surprisingly, then, a police officer violates the Fourth Amendment when he or she uses force that is not "reasonable," given all the attendant circumstances.

20

Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, <u>including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight</u>.

<u>Graham</u>, 490 U.S. at 396 (citations and internal quotation marks omitted) (emphasis supplied). The Court has, however, cautioned that the "calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation. <u>Id.</u> at 396-97. It is also important to note that the determination of whether an officer's conduct was "reasonable" is an objective one. Consequently, the individual officer's subjective intent and motivation are not relevant. <u>See</u> <u>Graham</u>, 490 U.S. at 397 ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively

21

reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). See also Jarrett v. Yarmouth, __ F.3d __, 2003 WL 21012641 at *8 (1st Cir. May 6, 2003) ("[O]bjective reasonableness is the touchstone of the excessive force inquiry.").

Perhaps due to the fact that deaths in police custody as a result of positional asphyxia are very rare - according to plaintiff's complaint, averaging fewer than 10 each year (presumably nationwide) over the past 15 years - the court of appeals for this circuit has yet to confront such a case. A few other federal courts have, however, been presented with cases involving deaths caused by positional asphyxia. In 1997, for example, the Court of Appeals for the Seventh Circuit considered a case involving positional asphyxia death under circumstances very much like those involved in this case. Estate of Phillips v. City of Milwaukee, 123 F.3d 586 (7th Cir. 1997). There, as here, the plaintiff did not claim that the defendant officers used excessive force at any time prior to the point at which the subject was handcuffed. Instead, like the plaintiff in this case, the decedent's estate asserted that "the excessive force

22

occurred during the few minutes that [the decedent] was on the floor in a prone position."  <u>Id.</u> at 591-92.

Notwithstanding the plaintiff's concession that much of the police officers' conduct was objectively reasonable, the court of appeals recognized that, because a determination of whether the officers acted reasonably turned upon an analysis of "the totality of the circumstances surrounding the encounter," it was appropriate to discuss in detail the facts prompting the officers to be called to the scene, as well as the violent struggle that ensued when they were confronted by the decedent.  The court then focused its attention on the officers' decision to leave the decedent handcuffed, in a prone position on the floor.

> Mr. Phillips was placed in a prone position with his hands and legs restrained because of the need to incapacitate him and to protect the safety of the officers and other witnesses from the dangers posed by Mr. Phillips' violent behavior.  <u>Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest</u>.  The medical evidence and witness testimony in this case shows that the officers did not punch, slap, kick or otherwise deliver a blow to Mr. Phillips' body.
>
> * * *
>
> Here, the officers did not hog-tie, choke or transport Mr. Phillips.  Nor were his medical conditions . . .

23

which were contributing factors to Mr. Phillips' death, observable to the untrained eye. None of the plaintiffs' materials supports that restraining an individual in a prone position carries with it a substantial risk of causing death or serious bodily harm. The officers placed Mr. Phillips in a face down position to restrain him from injuring himself and others. That force, it turned out, when combined with Mr. Phillips' other health problems, resulted in Mr. Phillips' death. But the question is not whether the officers' actions aggravated an undiscovered injury or condition, but whether their actions were objectively reasonable under the circumstances. Placing Mr. Phillips in a prone position was reasonable under the circumstances and therefore comported with the Fourth Amendment.

Id. at 593-94 (citations and internal quotation marks omitted) (emphasis supplied). Having concluded that the officers' conduct was objectively reasonable, the court held that they were entitled to judgment as a matter of law.

More recently, under circumstances far less favorable to the defendant officers, the Court of Appeals for the Fifth Circuit also concluded that police officers did not violate the Fourth Amendment rights of a suspect who died of positional asphyxia while in their custody. Wagner v. Bay City, 227 F.3d 316 (5th Cir. 2000). There, the defendant police officers engaged the subject in a violent struggle, during which they sprayed him with

24

cap stun a number of times. Eventually, they subdued him, handcuffed him with his hands behind his back, and forcibly restrained him on his stomach - one officer kept his knee on the subject's back while another "kept pushing [the subject's] neck and head to the ground with a stick." Id. at 319 (internal quotation marks omitted). At least one witness said that although the subject was no longer combative, the officers continued to treat him "aggressively." Id. at 321. Although the subject was no longer struggling (and because he may well have lost consciousness), the officers carried him to a police cruiser, where they placed him on his stomach and transported him to the county jail. During the drive to the jail, the transporting officer heard the subject make a couple "groans and grunts," but did not speak with him nor did the officer attempt to verify that he was breathing without difficulty. Id. at 319.

Once at the jail, the subject again had to be carried by the officers, at least one of whom reported that he was unsure whether the subject was conscious. The subject was carried/dragged into a cell, where he was again placed on his stomach. At that point, one of the arresting officers noticed

25

that the subject did not appear to be breathing.  The officers removed his handcuffs, turned him over, and began CPR.  He was then transported to a local hospital, where he slipped into a coma and eventually died.  Id.

Ultimately, the court concluded that there were "no apparent physical signs that [the subject] was substantially at risk" of harm from the form of restraint employed, and "nothing about the use of chemical spray or even a choke-hold was objectively-unreasonable conduct where the suspect physically resisted arrest."  Id. at 324.  Accordingly, the court held that the defendant police officers' actions "were all consistent with the idea that they merely were trying to restrain a violent individual.  Thus, those actions were objectively reasonable in the context of this dangerous situation that [the decedent] created, and we therefore reverse the denial of summary judgment on the excessive force claim."  Id.

The Court of Appeals for the Eleventh Circuit reached a similar conclusion in Cottrell v. Caldwell, 85 F.3d 1480 (11th Cir. 1996).  In that case, after a lengthy struggle with an

26

individual who was both violent and mentally ill, the defendant police officers were finally able to restrain him. They then placed him face down in a police cruiser, with his legs restrained and hands cuffed behind his back. During the brief (approximately five-minute) ride to the police station, the decedent died of positional asphyxia. As is the case here, the plaintiff claimed that the defendant police officers employed excessive force by improperly restraining the decedent and then failing to adequately monitor his breathing, in violation of the Fourth Amendment. In support of that claim, the plaintiff introduced expert testimony to the effect that: (1) "it was well known by police on the day of [the decedent's] death [that] improper restraint of arrested persons, particularly those on medication and/or who have engaged in strenuous activity, could quickly cause death by asphyxiation;" and (2) "generally accepted United States police custom and practice dictates that arrested persons whose hands and legs have been restrained [not be left face-down in a prone position]," and (3) "generally accepted United States police custom and practice also dictates that, no matter how they may be restrained, arresting officers constantly

27

monitor the health and well-being of persons in their custody."
Id. at 1488-89.

Nevertheless, the court concluded that the defendant police officers did not, as a matter of law, act in an objectively unreasonable fashion and held that "the events surrounding the arrest and the force applied make it clear that there is no genuine issue of material fact concerning excessive force in this case, and the defendant officers are entitled to summary judgment as a matter of law." Id. at 1492. See also Fernandez v. Cooper City, 207 F. Supp. 2d 1371, 1379-80 (S.D. Fla. 2002) (officers did not use excessive force in restraining subject who eventually died of positional asphyxia, notwithstanding fact that, during a struggle, they sprayed him with cap stun, retrained him in a prone position with handcuffs behind his back, and applied pressure to his torso to keep him in that position); Tofano v. Reidel, 61 F. Supp. 2d 289, 300 (D.N.J. 1999) (police officers did not use excessive force on subject who ultimately died of positional asphyxia, despite fact that they engaged him in violent struggle, sprayed him with cap stun, and restrained him in a prone position on the ground); Price v. County of San Diego,

28

990 F. Supp. 1230, 1237-41 (S.D. Cal. 1998) (police officers did not use excessive force on subject who died of positional asphyxia, notwithstanding fact that they hog-tied him and left him in a prone position, on hot asphalt, for several minutes without monitoring his breathing). But see Cruz v. Laramie, 239 F.3d 1183, 1188-89 (10th Cir. 2001) (holding that the use of a hog-tie restraint on an individual with an apparent and discernible diminished capacity constituted excessive force).

The case relied upon heavily by plaintiff in her brief in opposition to summary judgment, Garrett v. Athens-Clarke County, 246 F. Supp. 2d 1262 (M.D. Ga. 2003), involved facts that are readily distinguishable from those present in this case and, for that reason, it is not persuasive. First, the officers involved in that case restrained the subject by using the "hobble or hog-tie method." Id. at 1270. Plaintiff now concedes that the defendant officers never hog-tied Pliakos. Second, and perhaps more significantly, the officers in Garrett restrained the subject in a prone, hog-tie fashion after he became compliant and stopped resisting arrest. Id. at 1269-70. In this case, while the precise length of time that Pliakos continued to struggle

29

with the officers is unclear, no one denies that he actively resisted arrest even after he had been handcuffed.  See, e.g., Jones deposition at 31 ("We had him on the ground.  He attempted to get back up again, at which time I put my left knee on the middle of his back, and Officer Lachance put his knee on his shoulder.").  So, unlike the scenario in Garrett, where the subject could, conceivably, have been moved from a prone position into a seated position, Pliakos's recent violent struggle with several officers (and a police dog) and his continued efforts to resist even after having been handcuffed, presented the defendant officers with a far more volatile, uncertain, and dangerous situation.

Of course, as noted above, each case involving the alleged use of excessive force is unique and must be judged on its own facts.  And, as the Supreme Court has observed, factors that must be considered include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396 (citation omitted).  In this case, each of the Graham

30

factors weighs against plaintiff's claim that the officers used excessive force.  First, as to the "severity of the crime at issue," Pliakos's initial conduct - running along the highway and into traffic - might simply be viewed as having constituted disturbing the peace (or some similar, relatively minor criminal mischief).  But, it quickly escalated into an unprovoked and violent physical assault on several police officers (and a police canine).  Second, Pliakos's conduct posed an immediate and substantial risk to himself, drivers passing by on the dark highway, and the responding officers.  Finally, after he attacked the officers, he violently resisted their efforts to calm him and, eventually, take him into custody.  And, he continued that resistance (by trying to get to his feet), at least for a period of time, after he had been handcuffed and was lying on his stomach.

It is also significant that Pliakos was left in a prone position for, at the very most, three minutes after he stopped resisting, while the officers waited for the transport wagon to arrive.  See Jones deposition at 32.  Although the officers failed to notice that Pliakos had stopped breathing for

31

approximately one minute before he was told to get to his feet, they never simply walked away and left him unattended. Instead, both Jones and Lachance remained at his side, watching to make certain that he did not renew his efforts to get to his feet.

Of the nearly five minutes that Pliakos was restrained on his stomach, the officers certainly did not employ excessive force in holding him in that position during the two minutes or so that he continued to actively resist. The only real question here is whether the officers should have repositioned him at some point after he stopped struggling. On that point, the court concludes that, as a matter of law, it was not unreasonable for the officers to keep him on his stomach for approximately three minutes, while they waited to move him to the transport wagon. Among other things, they could have reasonably concluded that, if they had attempted to reorient Pliakos to a seated position, he might well have renewed his efforts to get to his feet - efforts which, if successful, could have resulted in Pliakos running into highway traffic and, at a minimum, would have required the officers to again attempt to bring him to the ground (with greater risk of injury to him, given the fact that his hands were

32

cuffed behind his back). The officers also knew that the transport wagon had been summoned and was en route to the scene (in fact, the police wagon was at the scene for at least a brief portion of the time Pliakos remained on his stomach).

Viewing the totality of the circumstances presented in this case, while Konstantinos Pliakos's death was certainly tragic, it was not the product of any Fourth Amendment violation(s) committed by one or more of the defendant police officers. In light of the rapidly evolving and violent situation confronted by the individual officers, and the fact that Pliakos continued to struggle and resist arrest even after he had been restrained, and the fact that, although the officers failed to discover Pliakos had stopped breathing approximately one minute before he was told to get up, they never left him unattended, the court holds that the officers did not, as a matter of law, use excessive force at any time against Pliakos.

Even assuming that the defendant officers <u>did</u> see the training video concerning positional asphyxia prior to the events in question (a point each of them denies), their decision to keep

33

Pliakos on his stomach - for his (reasonably perceived) safety and their safety as well - for those brief moments after he stopped resisting and until he could be secured in the transport wagon was not objectively unreasonable.  Consequently, the individual defendant police officers did not violate Mr. Pliakos's Fourth Amendment rights by virtue of having restrained him as they did.

    B.    <u>Qualified Immunity</u>.

Even if one could plausibly conclude that the officers did violate Pliakos's constitutional rights by applying excessive force in arresting him, they would still be entitled to the protections afforded by qualified immunity.  Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).

In determining whether defendants are entitled to qualified immunity, the court must engage in a two-step inquiry.

34

> The first prong is whether the constitutional right in question was clearly established at the time of the alleged violation. In the second prong, the court employs an "objective reasonableness" test in determining whether a reasonable, similarly situated official would understand that the challenged conduct violated the established right.

Napier v. Town of Windham, 187 F.3d 177, 183 (1st Cir. 1999) (citation omitted). And, when making those inquiries, "the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . years after the fact." Hunter v. Bryant, 502 U.S. 224, 228 (1991).

At the first stage of that inquiry - determining whether the constitutional right at issue was "clearly established" - courts must "define the right asserted by the plaintiff at an appropriate level of generality." Brady v. Dill, 187 F.3d 104, 115 (1st Cir. 1999). To qualify as a clearly established right, "the law must have defined the right in a quite specific manner, and . . . the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent ex ante to

35

reasonable public officials." <u>Id.</u>, at 116. <u>See also</u> <u>Saucier v.</u> <u>Katz</u>, 533 U.S. 194, 201 (2001) ("[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."); <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). As the Supreme Court recently observed:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

<u>Saucier</u>, 533 U.S. at 205.

36

A difficult question is presented in this case regarding the level of specificity with which it is appropriate to define the constitutional right plaintiff claims was violated. All can agree that the right not to be subjected to "unreasonable" or "excessive" force during the course of an arrest was, when Pliakos was taken into custody, clearly established. However, "[a] reasonable official's awareness of the existence of an abstract right, such as a right to be free of excessive force, does not equate to knowledge that <u>his</u> conduct infringes the right." <u>Smith v. Mattox</u>, 127 F.3d 1416, 1419 (11th Cir. 1997) (emphasis in original). If the constitutional right plaintiff claims was infringed must necessarily be defined more precisely, it is far less clear that such a right was "clearly established" at the time of Pliakos's arrest.

The record demonstrates that the force employed by the individual defendants in subduing Pliakos was objectively appropriate, given his violent behavior. As the Supreme Court has observed, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Graham</u>, 490

37

U.S. at 396.  Except for Pliakos's predisposition to positional asphyxia (due to, among other things, obesity, acute cocaine intoxication, cardiac hypertrophy, and his violent struggle), he likely would have suffered no lasting adverse effects from his brief detention on his stomach.  Reduced to its essence, then, the question presented is whether Pliakos had a clearly established right not to be restrained in the manner (and for the duration) that he was, in light of the risk factors he presented with regard to positional asphyxia (some of which were obvious and others of which were unknown to the officers).

To be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640.  Consequently, "[o]ne tried and true way of determining whether this right was clearly established at the time the defendants acted, is to ask whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights." Suboh v. Dist. Attorney's Office, 298 F.3d 81, 93 (1st Cir. 2002).  The case precedent discussed above does not establish a constitutional right not to

be handcuffed in a prone position if one presents some of the risk factors for positional asphyxia. In fact, many of the courts that have confronted this relatively rare situation have specifically concluded, under circumstances very much like those presented in this case, that there is no such constitutional right at all, much less a "clearly established" right. See, e.g., Phillips, supra; Cottrell, supra. Necessarily, then, an objectively reasonable police officer, presented with the violent circumstances that confronted the defendants on October 13, 1999, would not have realized that restraining Pliakos in the manner (and for the period of time) that defendants did would amount to a violation of his clearly established Fourth Amendment right to be free from unreasonable seizure or the use of excessive force.

Whether the defendant police officers erred, or were even negligent, in leaving Pliakos on his stomach for approximately three minutes after he stopped resisting and one minute after he exhaled loudly is not a critical issue in determining whether the officers are entitled to qualified immunity. Ultimately, the doctrine of qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those

39

who knowingly violate the law." Hunter, 502 U.S. at 229 (citation and internal quotation marks omitted). The undisputed material facts in this case establish, as a matter of law, that the defendant police officers were not plainly incompetent, nor did they knowingly violate the law. It is equally clear that a reasonable police officer, presented with the same facts and circumstances, would not have realized that the decision to leave Pliakos on his stomach for that brief period of time would amount to the use of excessive force in violation of Pliakos's Fourth Amendment rights.

II. Municipal Liability - Failure to Train.

In count three of her complaint, plaintiff asserts a section 1983 claim against the City of Manchester and Police Chief Mark Driscoll, in his official capacity, saying those defendants "failed to establish guidelines for, and/or train, supervise or educate [their] police officers . . . about correct practices and procedures in the use of force and restraint in the apprehension of a suspect, in specific, the danger of positional asphyxia." Complaint, para. 33 (emphasis supplied). Plaintiff's claim against the police chief in his official capacity is, in effect,

40

a suit against the City of Manchester.  See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. . . . [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is not a suit against the official personally, for the real party in interest is the entity.") (citations and internal quotation marks omitted) (emphasis in original).

Because the individual defendants did not violate Pliakos's constitutionally protected right to be free from unreasonable seizures, plaintiff's section 1983 claim against the City (and the police chief, in his official capacity) necessarily fails. See Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer," that person has no claim under section 1983 against the officer's municipal employer). Moreover, even if Pliakos's constitutional rights had been violated, both the City and Chief Driscoll would still be entitled to summary judgment.

41

Municipalities cannot be held liable for the constitutional injuries caused by their employees on a theory of respondeat superior. See Monell v. Dept. of Social Servs., 436 U.S. 658, 694-95 (1978). Instead, "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." Canton v. Harris, 489 U.S. 378, 385 (1989) (emphasis in original). And, where the basis for a plaintiff's claim against a municipality is its alleged failure to properly train its police officers, the Court has held that the "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388 (emphasis supplied). So, as the court of appeals for this circuit has observed, "[a] municipality or its supervisory personnel can be held liable for the constitutional misconduct of its employees only on the basis of an 'affirmative link' between their acts and those of the offending employee. In order to establish municipal liability, the plaintiff must show that the acts or omissions of the municipality's policymakers evidence 'deliberate indifference' to

42

the rights of its inhabitants." Gaudreault v. Salem, 923 F.2d 203, 209 (1st Cir. 1990) (citations omitted).

The most common means by which a plaintiff may demonstrate a municipality's "deliberate indifference" is by: (1) identifying a pattern of constitutional violations that has put the municipality on notice that its training is deficient; and (2) showing that, notwithstanding such notice, the municipality continued to adhere to the same training regimen. See Board of the County Comm'rs v. Brown, 520 U.S. 397, 407 (1997) ("If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action - the 'deliberate indifference' - necessary to trigger municipal liability."). Here, however, nothing in the record suggests that the City of Manchester or its police department was aware of any incidents of positional asphyxia stemming from Manchester police officers having restrained subjects in a prone position.

43

Alternatively, absent evidence that a municipal defendant had notice of the need to alter a policy or training program, a plaintiff may, "in a narrow range of circumstances," Brown, 520 U.S. at 409, prove a failure-to-train claim by showing that:

> in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

Harris, 489 U.S. at 390. As an example, the Court posited the following:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

Id. at 390 n.10 (citation omitted).

44

In this case, however, the Manchester Police Department plainly recognized the need to train its officers with regard to the rare but real risks associated with positional asphyxia. Accordingly, one of its training officers gave a lecture on that very subject. And, that lecture was preserved on video tape so it could be shown again, either to new officers or as a refresher to those who had already seen it.

The record also reveals that the Manchester Police Department showed that video tape at a number of roll call meetings of its officers in the days immediately prior to the events at issue in this case. That the department failed to ensure that the individual defendants in this case saw the video prior to their confrontation with Pliakos (assuming they did not see it) does not, standing alone, serve to demonstrate that it was "deliberately indifferent" to the rights of citizens with whom the police have contact; at most, that failure might be viewed as negligent. But, as the Supreme Court has repeatedly made clear, a section 1983 claim against a municipality cannot be based upon a mere showing of negligence. See, e.g., Brown, 520

U.S. at 407 ("A showing of simple or even heightened negligence will not suffice.").

In short, the record is devoid of any evidence even remotely suggestive of "deliberate indifference" on the part of the City of Manchester.  In fact, just the opposite is the case.  The fact that the Manchester Police Department produced a training video discussing the risk factors associated with positional asphyxia suggests that it was engaged in a reasonable effort to keep its officers informed of the latest information available concerning safe methods by which subjects might be restrained.  That the individual defendants in this case may not have seen the training video until after the events at issue here, or that they saw but did not benefit from it, does not, without more, amount to "deliberate indifference" on the part of the municipality.

III. Plaintiff's State Law Claims.

In counts four through twelve of her complaint, plaintiff advances several state common law and constitutional claims, over which she asks the court to exercise supplemental jurisdiction. Complaint at para. 4.  See also 28 U.S.C. § 1367.  Section 1367

46

provides that the court may decline to exercise supplemental jurisdiction over a plaintiff's state law claim when:

> (1)  the claim raises a novel or complex issue of State law,
>
> (2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)  the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  To assist district courts, the Court of Appeals for the First Circuit has identified the following additional factors that should be considered when determining whether to exercise supplemental jurisdiction over state law claims: (1) the interests of fairness; (2) judicial economy; (3) convenience; and (4) comity.  See Camelio v. American Fed'n., 137 F.3d 666, 672 (1st Cir. 1998).  With regard to principles of fairness and comity, the Supreme Court has observed:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not

47

> insubstantial in a jurisdictional sense, the state
> claims should be dismissed as well.

United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) (footnote omitted).

Given that this case is "at an early stage in the litigation," Camelio, 137 F.3d at 672, and in the interests of both comity and fairness to the parties, the court declines to exercise supplemental jurisdiction over the state law claims in counts four through twelve of plaintiff's complaint.

## Conclusion

That Konstantinos Pliakos died during the early morning hours of October 13, 1999, while in the custody of Manchester police officers, is undeniably a tragedy and, no doubt, a devastating loss to his family and friends. Indeed, one cannot doubt that the police officers who were present at the scene are traumatized as well, and wish the result had been different. What is presently before the court, however, is a very limited question of law: whether a properly instructed trier of fact could conclude on this record that the defendant police officers

acted in an objectively unreasonable manner when, after finally securing Mr. Pliakos in handcuffs, they left him on his stomach - with two officers at his side - for approximately three minutes after he stopped struggling (and approximately one minute after Officer Jones heard him exhale) before attempting to get him to his feet. Given the undisputed material facts of record, a reasonable trier of fact must conclude that the officers' conduct was not, under the circumstances, objectively unreasonable.

Of course, cases of this sort are necessarily sui generis and the court's holding does not imply that under different circumstances involving death or injury to a subject restrained on his or her stomach while handcuffed from behind, the outcome would necessarily be the same. Each case must be resolved on its own unique set of facts. But, under those presented in this case, the means by which the defendant police officers restrained Pliakos (and the duration of that restraint) did not constitute excessive force. Consequently, they did not violate Pliakos's Fourth Amendment rights. Moreover, even if one concluded that the officers' conduct did amount to a constitutional violation, they would still be entitled to qualified immunity.

49

Similarly, the City of Manchester and Police Chief Driscoll, in his official capacity, are entitled to judgment as a matter of law. Because the defendant officers did not violate Pliakos's Fourth Amendment rights, plaintiff's section 1983 claim against the City necessarily fails. And, even if the officers had violated Pliakos's constitutional rights (but are, nevertheless, shielded from liability by qualified immunity), the record establishes that the City did not maintain a police officer hiring and/or training program that was "deliberately indifferent" to the constitutional rights of individuals with whom police officers are likely to have contact.

Defendants' motion for summary judgment (document no. 12) is granted as to the two remaining federal claims in plaintiff's complaint (counts one and three). The court declines to exercise its supplemental jurisdiction over plaintiff's state constitutional and common law claims. Those claims are dismissed, without prejudice to refiling in state court.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

50

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

July 15, 2003

cc:   Lawrence A. Vogelman, Esq.
      Donald A. Gardner, Esq.